J-S65045-17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BRIAN CHARLES WINTER, | : | |
| | : | |
| Appellant | : | No. 3545 EDA 2016 |

Appeal from the Judgment of Sentence October 14, 2016
in the Court of Common Pleas of Delaware County,
Criminal Division, No(s):  CP-23-CR-0006660-2014

BEFORE:  OLSON, OTT and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED NOVEMBER 21, 2017**

Brian Charles Winter ("Winter") appeals from the judgment of sentence imposed following his convictions of two counts each of corruption of minors and indecent assault (complainant less than 16 years of age).[1]  We affirm.

In its Opinion, the trial court set forth the relevant factual and procedural background, which we adopt for the purpose of this appeal.  ***See*** Trial Court

---

[1] ***See*** 18 Pa.C.S.A. §§ 6301(a)(1)(ii), 3126(a)(8).

Opinion, 5/1/17, at 1-9.[2]

On appeal, Winter raises the following issues for our review:

1. Was the verdict against the weight and sufficiency of the evidence where the Commonwealth did not meet its burden of proof to establish a course of conduct for the two (2) counts of corruption of minors, as the night in question was not a "course of conduct[]" [because] both alleged victims testified that the allegations of the night in question were an isolated event and not a course of conduct[,] which is an essential element of 18 Pa.C.S.A. § 6301[(a)(1)(ii)]?

2. Was the verdict against the weight and sufficiency of the evidence where the Commonwealth did not meet its burden of proof that there was indecent contact[,] as required for the two (2) counts of indecent assault of a person less than 16 years of age under 18 Pa.C.S.A. §[]3126[(a)(8)], where the girls' testimony was directly in conflict with each other and with their own prior recorded statements, and where the girls did not establish any actual indecent contact?

3. Was the verdict against the weight and sufficiency of the evidence where the testimony of the alleged victims was so in conflict with each other, and with their own prior recorded statements, that the same cannot be the grounds for guilt beyond a reasonable doubt on any of the charges?

4. Did the trial court abuse its discretion and/or err as a matter of law by precluding [Winter's] expert from interviewing victim K.J., notwithstanding that the same is required by the code of ethics governing experts testifying to psychiatric matters, and

_____

[2] As noted by the trial court in its Opinion, Winter's Concise Statement of matters complained of on appeal was untimely. **See** Trial Court Opinion, 5/1/17, at 9 n.1. While we could find waiver based on the untimeliness of the Concise Statement, we decline to do so, as the trial court addressed Winter's issues. **See Commonwealth v. Thompson**, 39 A.3d 335, 340 (Pa. Super. 2012) (declining to find waiver because the trial court had addressed the issues raised in the untimely concise statement); **see also Commonwealth v. Burton**, 973 A.2d 428, 433 (Pa. Super. 2009) (*en banc*) (holding that "[w]hen counsel has filed an untimely Rule 1925(b) statement and the trial court has addressed those issues[,] we need not remand and may address the merits of the issues presented.").

by limiting the expert testimony to such a degree that [Winter's] expert was incapable of ethically rendering an expert opinion to a reasonable degree of medical certainty at trial?

5. Did the trial court abuse its discretion and/or err as a matter of law by excluding from evidence the Facebook profile of victim M.M., which showed a strikingly different persona of the victim than what was presented at court, as well as excluding a specific photograph/post posted on the Facebook profile of one of the victims, M.M., shortly before her testimony at trial, directly indicating that she would cover up a crime scene for a friend[?]

Brief for Appellant at 4-5 (some capitalization omitted).

In his brief, Winter combines his sufficiency of the evidence and weight of the evidence arguments, as raised in his first three issues, with respect to each of his convictions.[3]   However, sufficiency of the evidence claims are distinct from weight of the evidence claims, as there are different standards of review, as well as separate remedies.  *See Commonwealth v. Birdseye*, 637 A.2d 1036, 1039 (Pa. Super. 1994).

> [O]ur standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.  Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty.  [T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence.  Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak

---

[3] Pursuant to Pa.R.A.P. 2119, Winter was required to divide his argument "into as many parts as there are questions to be argued …."  Pa.R.A.P. 2119(a). Although Winter failed to follow Rule 2119 by combining his first three issues in the Argument section of his brief, we decline to find waiver.

and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

***Commonwealth v. Franklin***, 69 A.3d 719, 722 (Pa. Super. 2013) (citations and quotation marks omitted).

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Commonwealth v. Widmer***, 744 A.2d 745, 753 (Pa. 2000) (internal citations omitted).

"[W]hile a challenge to the sufficiency of the evidence can be legally distinguished from a challenge to the weight of the evidence, where the evidence is legally sufficient, it generally meets the test for weightiness." ***Commonwealth v. Shaffer***, 722 A.2d 195, 200 (Pa. Super. 1998).

With regard to Winter's corruption of minors convictions, he contends that, under 18 Pa.C.S.A. § 6301(a)(1)(ii), the Commonwealth was required to prove that he engaged in a "course of conduct" comprised of more than one act. Brief for Appellant at 15. Winter asserts that, because both girls testified that "this was an isolated act, which had not happened before, the Commonwealth has not established a pattern of conduct sufficient to support a conviction under this statute." ***Id***. at 16.

- 4 -

Winter's argument addresses only his claim that the evidence was insufficient to support his corruption of minors convictions.[4]  In its Opinion, the trial court addressed Winter's challenge to the sufficiency of the evidence supporting his convictions of corruption of minors, set forth the relevant law, and determined that the challenge lacks merit.  **See** Trial Court Opinion, 5/1/17, at 10-12.  We agree with the reasoning of the trial court, and affirm on this basis at to Winter's challenges to the weight and sufficiency of the evidence supporting his convictions of corruption of minors.  **See id**. at 10-12.

With regard to Winter's indecent assault convictions, he contends that "there were numerous inconsistencies in the trial testimony of both alleged victims, as well as their prior statements."  Brief for Appellant at 16.  Winter asserts that K.J. told police that they "went on an adventure and [Winter] let them drive his car," but claims that M.M. "expressly denies ever even going to the parking lot[,] and says when they asked to drive his car[,] he said it was not a good idea."  **Id**.  Winter further argues that, whereas M.M. stated

_____

[4] In his brief, Winter makes no argument regarding his claim that his corruption of minors convictions are against the weight of the evidence. Accordingly, this issue is waived.  **See** Pa.R.A.P. 2119(a) (stating that the parties' briefs must include a discussion of each question raised on appeal and a "citation of authorities as are deemed pertinent."); **see also Commonwealth v. Murchinson**, 899 A.2d 1159, 1160 (Pa. Super 2006) (deeming appellant's claims waived under Pa.R.A.P. 2119(a) because he did not develop meaningful argument with specific references to relevant caselaw and to the record to support his claims).  Even if Winter had not waived this issue, we would have concluded that it lacks merit for the reasons expressed by the trial court in its Opinion.  **See** Trial Court Opinion, 5/1/17, at 13-15.

that he had touched K.J.'s vaginal area, K.J. stated that "he only humped her leg." *Id*. Winter claims that these inconsistencies "make it *impossible* for a jury to glean the truth, and his conviction is a shock to one's sense of justice." *Id*. at 17 (emphasis in original).

Winter's argument addresses only his claim that his indecent assault convictions are against the weight of the evidence.[5] The trial court addressed Winter's challenge to the weight of the evidence supporting his indecent assault convictions, set forth the relevant law, and determined that the challenge lacks merit. *See* Trial Court Opinion, 5/1/17, at 13-15. We agree with the reasoning of the trial court, and affirm on this basis at to Winter's challenges to the weight of the evidence supporting his indecent assault convictions. *See id*. at 13-15.

In his fourth issue, Winter contends that the trial court erred by denying his request that K.J. submit to an independent psychiatric evaluation by Winter's expert. Brief for Appellant at 18. Winter asserts that, after reviewing K.J.'s psychiatric records, his expert concluded that "K.J. was either severely delusional, or had been embellishing her psychiatric symptoms and misleading her treating physicians for several years." *Id*. Winter argues that he sought

---

[5] In his brief, Winter makes no argument regarding his claim that the evidence was insufficient to support his indecent assault convictions. Accordingly, this issue is waived. *See* Pa.R.A.P. 2119(a); *see also Commonwealth v. Murchinson*, *supra*. Even if Winter had not waived this issue, we would have concluded that it lacks merit for the reasons expressed by the trial court in its Opinion. *See* Trial Court Opinion, 5/1/17, at 12-13.

to present expert testimony that K.J. was incompetent to testify at trial. *Id*. Winter claims that, even if K.J. "was determined to be competent to testify, the expert opinion sought would have been highly probative impeachment evidence." *Id*. Winter contends that, as a result of the trial court's ruling, he "was stripped of the opportunity to introduce probative and crucial information which may have seriously impacted the verdict …." *Id*. at 18-19.

In its Opinion, the trial court addressed Winter's fourth issue, set forth the relevant law, and determined that the issue lacks merit. *See* Trial Court Opinion, 5/1/17, at 15-16. We agree with the reasoning of the trial court, and affirm on this basis as to Winter's fourth issue. *See id*.

In his fifth issue, Winter contends that the trial court abused its discretion by precluding him from introducing into evidence numerous Facebook postings by M.M. Brief for Appellant at 19. Winter asserts that the postings "taken as a whole, showed a vastly different person than the victim purported to be on the stand." *Id*. Winter claims that "[p]ortraying such a different image on the stand versus social media is, in itself, a form of deception and relevant for jury consideration." *Id*. Winter argues that the postings were not barred by the Rules of Evidence, were more probative than prejudicial, and that it was manifestly unreasonable for the trial court to exclude them. *Id*.

In its Opinion, the trial court addressed Winter's fifth issue, set forth the relevant law, and determined that the issue lacks merit. *See* Trial Court

Opinion, 5/1/17, at 16-18.  We agree with the reasoning of the trial court, and affirm on this basis as to Winter's fifth issue.  *See id*.

Judgment of sentence affirmed.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/21/2017

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA   |   NO.     6660-14

v.

BRIAN WINTER

## OPINION

*Mallon, J.*                                                          *Filed:* 5-1-17

Appellant Brian Winter appeals to the Superior Court from the Judgment of Sentence entered by this Court on October 14, 2016. The nature and history of the case are as follows:

### I. Nature and History of the Case

Following a two day trial, the Appellant was convicted of two counts of corruption of minors, each a felony of the third degree, and two counts of indecent assault, each a misdemeanor of the second degree.

At trial the Commonwealth produced evidence that established that on the evening of August 11, 2014, the victims in this case, M.M., a female of 14 years of age, and K.J, a female of 14 years of age, were invited to the Appellant's home to drink alcohol. While in his home, the Appellant did the acts leading to his conviction. It was established the Appellant, prior to the date of the incident, had a rapport with K.J. N.T., 6/29/16, p. 124. Earlier that day, M.M. and K.J. had spent the afternoon at "the trestle", a creek in the area of Drexel Hill and Clifton Heights, where they went swimming with friends. *Id.* at 34. While they were swimming, the Appellant arrived in his car. The Appellant had a young child along with him and he approached the girls and spoke to K.J. *Id.* at 36. At the conclusion of their discussion, the girls and the Appellant made plans to convene later at the Appellant's house and drink alcohol. *Id.* at 123. The Appellant told the girls that he would get the alcohol for them. *Id.* at 37-38, 125.



K.J. left with the Appellant in his car and they dropped off the young child while M.M. went home to get a change of clothes. *Id.* at 128-29. About an hour later, the Appellant and K.J. picked up M.M. and they went to get alcohol. The Appellant purchased Four Loko beer. *Id.* at 128-34. Afterward, the three returned to the Appellant's home, where there were also three small children and two adults present. *Id.* at 134. M.M. and K.J. played with the children for a short while, and then went out to the back deck to smoke cigarettes. *Id.* at 135. The Appellant poured the beer into plastic cups and the girls drank them on the back deck. *Id.* at 46, 135-37. Both M.M. and K.J. testified that the beer made them feel intoxicated.

Eventually the small children and two adults went to bed and M.M., K.J., and the Appellant left the deck and went to the living room and watched some television. *Id.* at 49-50. Later the girls told the Appellant that they were ready for bed and the Appellant said that they could sleep upstairs in his bedroom. *Id.* at 51. The Appellant told the girls that he wanted to sleep on the couch in the living room. *Id.* When M.M. couldn't make it up the stairs on her own, the Appellant carried her up the stairs over his shoulder. *Id.* at 52. K.J. remained downstairs. *Id.* When M.M. and the Appellant got to his room, the Appellant laid M.M. on his bed and attempted to kiss her. *Id.* at 53. M.M. turned her head away to avoid the Appellant's advances and she asked him if he would go and get K.J. *Id.* at 54. The Appellant ignored M.M. and proceeded to tell her that she "had a nice body" and touched her stomach. *Id.* at 54-55. When he continued to ignore her requests for K.J., M.M. began calling K.J.'s name. *Id.* at 65. The Appellant responded by telling her that she was going to wake up the young children in the house and then left the room to get K.J. *Id.* at 56.

The Appellant returned with K.J., and instead of then going back downstairs to the living room to sleep as he had said he would, he remained in the bedroom. He took off his pants and

2

asked the girls if they had ever had a threesome. *Id.* at 58. He then lay down in bed next to them. *Id.* at 59. The girls asked the Appellant to go downstairs to the couch as he had said he would. *Id.* They also offered to go sleep on the couch instead. *Id.* The Appellant ignored these requests and attempted to put his hand in M.M.'s pants. *Id.* at 60. M.M. tried to push the Appellant's hand away and asked him to stop. *Id.* at 60. She then moved closer to K.J. *Id.* In response, the Appellant told M.M. to calm down and he put his hand up her shirt and touched her bra. *Id.* at 60-61. M.M. then asked the Appellant if he could get them some water and something to eat. *Id.* at 62. He complied, and returned with two glasses of water and a snack. *Id.* at 62.

When he returned, the Appellant climbed back into the bed in between the girls. *Id.* at 62. The girls again asked him if he would go downstairs, and when he didn't, they left the bedroom together and went into the bathroom. *Id.* at 63. There, the girls decided that they would leave the house and they gathered their belongings and ran downstairs and out the front door. *Id.* at 65. The Appellant gave chase to the girls for a short while but then retreated home. Once they were a distance away, the girls waved down a car and asked the driver to call 911. *Id.* at 71. The girls then went to Delaware County Memorial Hospital.

In addition to the testimony of the victims, the jury heard testimony from Shannon Hanshaw, an emergency room nurse at Delaware County Memorial Hospital. Hanshaw, a nurse of twelve years and a sexual assault nurse examiner for adults and adolescents. *See* N.T., 6/29/16, pp. 181-82. Nurse Hanshaw was accepted by the court as an expert in sexual assault nurse examinations and general nursing. Nurse Hanshaw examined both M.M. and K.J. on August 12, 2014 following their arrival to the hospital. *Id.* at 190-92. Nurse Hanshaw testified that her physical exam of M.M. did not reveal any signs of trauma and recounted that the patient reported as follows:

3

Patient states that between 2:30 and 3 o'clock, they went to [J's] house to get [J] and [K] to go to the trestles. She reports that they were swimming on the rope and reports that [K.J.] and her were on the rope together and they both fell off the rope. She said Brian came to the trestle in his car with [B]. [K.J.] got out of the water to talk to them because she said she used to babysit [B]. Brian said that he could go get" -- it says ETOH, which is alcohol -- "for [K.J.]. Brian went home to drop [B] off. At that time [J] and [K] left. The patient then reports that she wasn't able to go home if she was drinking because her mom would know. [K.J.] and the patient made a plan to have the patient sleep at Pastor Bob's. Pastor Bob won't let the patient sleep over per [K.J.]. Then Brian called Pastor Bob to tell Pastor Bob that [K.J.] would be sleeping at his house, referring to Brian's house, to babysit the kids. Brian then drove the patient to her house. The patient reports she asked her mom if she was able to sleep at her friend [A's] house. The patient states that her mom said yes, just to have [A's] mom or dad call her to give her the address. The patient states that they left her house and saw that Brian and [K.J.] were not outside. She reports that she then called Pastor Bob to see if he had talked to [K.J.]. The patient then states that Pastor Bob was with [K.J.]. The patient states that she wants her to go walk to [K.J.'s] to give her her shoes. [K.J.] said she would walk to [K.J.'s] to give her her shoes. The patient would then -- said is everything settled. All Brian has to do is to call her mom and act like he's [A's] dad. Brian then said okay. [K.J.] and the patient went into Brian's house. [K.J.] and the patient then changed out of their creek clothes in the bathroom. The patient states that her and [K.J.] were taking care of the kids, made them soup, and they were letting the kids and apply makeup on them. The patient then reports that [K.J.] and her put the kids to sleep, then she reports that [A's] dad and stepmom were on the couch and were -- and they were not allowed to walk up there. [A's] dad and stepmom went to sleep and all the kids went to sleep as well. Brian them gave them, which is the patient and [K.J.], Four Lokos out back. [K.J.] started running outside and Brian went her to get her to stop. Brian then stated that they couldn't stay outside because Eric would see them and call the cops. All three went into the house, sat on the couch to watch TV. They were watching TV. [K.J.] wanted pizza so Brian got her pizza. [K.J.] was eating pizza and Brian started telling [K.J.] that she was fat. Then [K.J.] started getting sick. She was making herself vomit. Brian then said it was time to go to sleep, and the patient states that [K.J.] and herself were going to sleep in Brian's bed and Brian was going to sleep on the couch. The patient then states that Brian then carried the patient upstairs. Brian then put the patient on his bed, on Brian's bed, and kept trying to kiss her. She states that she kept moving her head saying I'm only 14 and you need to get [K.J.]. Brian states I will go get her. Brian went to get [K.J.]. [K.J.] then laid next to the patient. Brian stated I want to lay in the middle. The patient said no, I want to lay next to [K.J.]. Brian said no, I want to be in the middle. Brian was in the middle. Brian started touching the patient's leg, her butt and her stomach. The patient reports that she pushed Brian's hand away. Brian then said look at you, you have a banging body. The patient stated I'm only 14. Patient states that she then told [K.J.] to hold her. They were holding hands, and Brian kept touching my private area and went up my skirt. I asked did she still --

4

my question to the patient was, did she still her clothes on, and the patient did respond saying she still had her clothes on. The patient states that then she wanted something to eat and drink, asked Brian to get her something. Brian went to get it. Patient states she rolled over to [K.J.], then Brian came back, gave them water and cheese balls. Brian then laid next to the patient. Brian kept touching her private area and stomach. He kept trying to pull my pants off but I kept pulling them up. Patient then looked at [K.J.], lipped to her that he is touching me. Brian then said let's have a threesome. Then he said let's get naked. Then nobody spoke. Brian then said why are you not getting naked. Brian then said you take your clothes off and I will take mine off. Patient stated no, I'm only 14. [K.J.] wrapped her leg around the patient to cover patient's private area. Brian went into her pants with his hands. Patient reports that she pulled his hand out, rolled over to face [K.J.]. Then the patient states [K.J.], can you come into the bathroom with me, and then [K.J.] said yes. They went into the bathroom. They locked the door, and states to [K.J.], I don't care if I get into trouble, I can't stay here. [K.J.] stated if she, which is [K.J.], got into trouble with Pastor, she, [K.J.], would lose her brother, Ricky. Patient states to [K.J.] we have to leave, I'm leaving with or without you. [K.J.] stated that they would leave but would have to report it to the police. The patient states no, it stays between me and you. Then the patient stated that she went to go get their things from the baby's room, went downstairs to sneak out, and Brian was down there on the couch. The patient stated she told [K.J.] to run out the door, and then Brian got up and came out after them. He, meaning Brian, started following us up the street to the 7-11 and [K.J.] said don't look back, keep walking. Brian was saying you can't leave, it's four in the morning, get in. Patient reports that she started to cry and scream. Then they crossed the street. Brian was yelling across the street to look. The patient states leave us alone, we are going to call the cops. Brian kept walking saying what's your problem. The patient stated I swear to God, my dad will kill you. Patient then states I called him a perv. The patient and [K.J.] continued to walk to the 7-11 to call the police. Then they saw someone driving. They both walked into the middle of the street to the car they pulled over and they called the cops and the cops came.

N.T., 6/29/16, pp. 185-190.

Nurse Hanshaw explained that in her profession opinion, M.M.'s story was consistent with the fact that there no physical injuries. *Id.* at 190. Nurse Hanshaw testified that she also conducted an exam of K.J. in a separate room. *Id.* at 192. She recounted that the patient reported as follows:

Patient reports that at 8 o'clock on the 11th, which was the day prior to, that the patient and [M.M.], [J] and [K] were down at the trestles playing on a rope swing. Then a car came to where the patient and her friend were. Brian Winters came out of the car with [B], who is eight years old. They stood there for a while watching the patient after going off the rope, and then Brian came up to them and said why don't I take [B] home and bring back a six-pack. Brian left. [J] and [K] left.

5

However, they did not go with Brian. [M.M.] and the patient made a plan. Brian was going to call Pastor Bob and tell him that he needed an emergency babysitter, then he was going to call [M.M.'s] mom as a friend's dad saying [M.M.] could sleep over. Brian came back with beer but Brian, [M.M.] and the patient decided to wait at the top of [M.M.'s] street so they could get the patient's clothes. The patient then said they went on an adventure. And then I said who is 'we' is my question to [K.J.], and she said [M.M.], Brian and 1 herself. So they went to Wawa. Brian bought cigarettes. Then they all went to an empty parking lot and Brian let us drive the car. They all went back to the creek because we left their lighters there. Brian then went to Rudy's Bar to get Loko Four. It's in a tall can. Then they went back Brian's house. When they got back to his house, all four kids were still awake. Brian then asked if we were thinking. Patient responded yes. [M.M.] and patient went out back to smoke. Brian then came out with two blue cups. They drank it, unsure if he put anything in it other than the Loko Four. Patient reports that [M.M.] and the patient got drunk. She then reports that both [M.M.] and her went inside on the couch. She reports that a little while later Brian then carried [M.M.] upstairs. Brian said to the patient that wasn't pretty. [M.M.]-- I wasn't pretty like [M.M.] and was fat so the patient made herself vomit. Patient states she then walked up the steps. [M.M.] and the patient were lying in the bed. Brian states he was going to go to sleep on the couch. Brian then ends up in the bed between [M.M.] and [K.J]. [M.M.] somehow got in the middle of the bed and Brian started touching her. My question to [K.J.] is who was 'her," and [K.J.] responded it was [M.M.]. Patient then pulled [M.M.] close to her and wrapped her arm and legs around [M.M.]. Then Brian said we should have a threesome. Patient states no, which would be [K.J.]. Then Brian states let's all get naked. Brian said I will go first. Brian took off his pants. He had boxers and a shirt on. [K.J.] states she was still protecting [M.M.] while he pulled the patient's leg, which would be [K.J's], between his legs, and he started humping my leg like a dog. Then Brian started moving slowly up the patient's leg with his hand. Brian then started touching me in my private area with his hand. My question to [K.J.] was there any penetration. [K.J.'s] response was no. Then Brian started moving his hand very fast in my private area. [K.J.] states that she pushed Brian's hand away. [K.J.] states that [M.M.] then states she has to go to the bathroom so [K.J.] reports that her and [M.M.] walked to the bathroom and [M.M.] started crying in the bathroom. [M.M.] states he touched me, he 18 touched me, we've got to leave. [K.J.] then states they went into the kids' room and got their backpacks so they could sneak out. [M.M.] and [K.J.] started to walk downstairs and saw Brian sitting on the couch. [K.J.] states [M.M.] and herself started to walk out the door and Brian said where are you going. They just kept walking. They walked towards the 7-11. Brian was following them telling them they had to go back to the house because they were drunk and they need to go to bed. Then [M.M.] and [K.J.] see a car. [M.M.] was crying, and [K.J.] went into the street to flag the car down, and that's when the police were called. And then I asked [K.J.] if Brian kissed her, and she said yes, he kissed herself and [M.M.], and when I asked her where, she responded on her lips. I proceeded to ask if her there was anywhere else, and her response was no.

6

N.T., 6/29/16, pp 193-96.

Nurse Hanshaw's exam of K.J. did not reveal any physical findings. Similarly, she testified that in her professional opinion, what K.J. told her was consistent with her findings. *Id.* at 196.

Sergeant Stephen Brown of the Clifton Heights Borough Police Department also testified at trial. Sergeant Brown testified that a call came in with a report that a young girl was touched by a male named Brian Winter and described that he was wearing boxer shorts. N.T., 6/30/16, p. 36. Sergeant Brown responded to the hospital following the 911 call and met and spoke with both victims. N.T., 6/30/16, p. 37, 40. He also met with them the following day at the police station. *Id.* The victims told Sergeant Brown that they had been given Four Loko beer by the Appellant and recounted the events that happened in his bedroom. *Id.* at 50, 70.

After he met with the victims, Sergeant Brown, along with two other officers, proceeded to the Appellant's residence. The officers arrived at approximately 7 A.M. and the Appellant was immediately placed under arrest and taken back to the police station. *Id.* at 41-42. A search warrant was later executed at the Appellant's residence and the officers found two Four Loko cans in a cooler on the back deck, which was the brand of alcohol specifically identified by the girls. *Id.* at 69-70.

Sergeant Brown met with the Appellant at the police station and the Appellant gave a recorded statement. *Id.* at 48. The Appellant denied providing the girls with any alcohol and stated that he knew nothing about a sexual assault. *Id.* at 51. The Appellant told Sergeant Brown that he did notice that the girls were acting "goofy" and loud later in the evening so he told them to go upstairs and not to wake the young children. *Id.* at 52. He relayed that he told them to "go in the front room, and you know, that's my room, and make yourself at home, and I'm going to crash here on the couch." *Id.* at 58. The Appellant stated that he remained downstairs on the

7

couch and watched television until about 4 A.M. when the girls came downstairs and went out the front door. *Id.* at 52. He explained that he followed them outside and asked where they were going, and the girls responded that they were going home. *Id.* at 52. According to the Appellant, he told them that they couldn't be outside because it was so late. *Id.* at 53. He said that he followed them out of the house, but explained that eventually turned back because he wasn't wearing any shoes. *Id.* at 62. He repeatedly denied having any sexual contact with the girls.

Over the course of their investigation, the police also discovered that the Appellant's phone had been used to send text messages to M.M.'s mother. *Id.* at 72-73. At trial, M.M.'s mother recalled that on August 11, 2014 M.M. and K.J. stopped by her house to gather some towels. N.T. 6/29/16, pp. 170-72. Before she left, M.M. asked her mother for permission to sleep over her friend Lexi's house. *Id.* at 171. Her mother said yes and requested that Lexi's parents text her when they got there. *Id.* M.M.'s mother testified that she did receive a text message as promised, and in these text messages, the sender claimed to have been Brad, Lexi's father. M.M.'s mother was familiar with Brad and was under the assumption that M.M. was safe believing she was at Lexi's home when in fact she was at the Appellant's residence *Id.* at 173-75. The evidence revealed that these text messages originated from the Appellant's phone and not Lexi's dad's.

The jury returned its verdict on June 30, 2016. Defendant filed a post sentence motion challenging the weight of the evidence, which this Court denied on July 22, 2016. On October 14, 2016 this court sentenced Appellant to an aggregate sentence of 25 to 50 years of incarceration. On November 7, 2016, Appellant filed a notice of appeal necessitating this opinion and issued an order pursuant to Pa.R.A.P. 1925(b) on November 23, 2016. The court received

the Appellant's Concise Statement of Matters Complained of on Appeal on March 1, 2017[1] in which he sets forth the following:

1. The verdict was against the weight and sufficiency of the evidence as the Commonwealth did not meet the burden of proof for establishing a pattern of conduct for the two (2) Counts of Corruption of Minors as the night in question was not a "pattern of conduct." Rather, both alleged victims testified that the allegations of the night in question were an isolated event and not a "pattern of conduct" which is a necessary element of 18 Pa.C.S.A. § 6301(a)(1)(ii).

2. The verdict was against the weight and sufficiency of the evidence as the Commonwealth did not meet the burden of proof that there was indecent contact as required for the two (2) counts of 18 Pa.C.S.A. § 3126(a)(8)—Indecent Assault of a Person Less than 16 Years of Age, where the girls' testimony was directly in conflict with each other, and with their own prior recorded statements, and where the girls did not establish any actual indecent contact.

3. The verdict was against the weight and sufficiency of the evidence as the testimony of the alleged victims was so in conflict with each other, and with their own prior recorded statements, that the same cannot be the grounds for guilt beyond a reasonable doubt on any of the charges.

4. The Trial Court abused its discretion and/or erred as a matter of law by precluding Defendant's expert from interviewing victim K.J., notwithstanding that the same is required by the code of ethics governing experts testifying to psychiatric matters, and by limiting the expert testimony to such a degree that Defense's expert was incapable of ethically rendering an expert opinion to a reasonable degree of medical certainty at trial.

5. The Trial Court abused its discretion and/or erred as a matter of law by excluding from evidence the Facebook profile of victim M.M., which showed a strikingly different persona of the victim than what was presented at court, as well as excluding a specific photograph/post posted on the Facebook profile of one of the victims, M.M., shortly before her testimony at trial, directly indicating that she would cover up a crime scene for a friend.

---

[1] While counsel's 1925(b) statement was clearly untimely, this court has addressed the issues raised therein in an effort to avoid remand and further delay Appellant's appeal. *See Commonwealth v. Thompson*, 39 A.3d 335, 340 (Pa. Super. 2012); *Commonwealth v. Burton*, 973 A.2d 428 (2009) (en banc); *Commonwealth v. Castillo*, 585 Pa. 395, 888 A.2d 775, 780 (2005).

9

## II. Discussion

### I. Sufficiency of the Evidence

The Appellant challenges the sufficiency of the evidence for his convictions of corruption of a minors and indecent assault. In determining whether the evidence is sufficient to support a defendant's conviction, the reviewing court will consider the evidence admitted during the trial along with any reasonable inferences that may be drawn from that evidence in the light most favorable to the Commonwealth as the verdict winner. If the court finds, based on that review, that the fact finder could have found every element of the crime charged beyond a reasonable doubt, then it must sustain the conviction. *Commonwealth v. Murphy,* 577 Pa. 275, 284, 844 A.2d 1228, 1233 (2004) (citations omitted). A reviewing court may not re-weigh the evidence and substitute its own judgment for that of the fact-finder. *Commonwealth v. Jones,* 874 A.2d 108, 120-21 (Pa.Super. 2005).

In the case *sub judice*, a jury was tasked with weighing the evidence and making all credibility determinations in this case, and they found the Appellant guilty of two counts of corruption of minors and two counts of indecent assault. As explained below, this court submits that the evidence was more than sufficient to sustain the jury's verdict.

#### a. Corruption of Minors

Appellant first challenges the sufficiency of the evidence of his corruption of minors convictions "as the Commonwealth did not meet the burden of proof for establishing a pattern of conduct for the two (2) Counts of Corruption of Minors as the night in question was not a 'pattern of conduct.' Rather, both alleged victims testified that the allegations of the night in question were an isolated event and not a 'pattern of conduct' which is a necessary element of 18 Pa.C.S.A. § 6301 §§A1ii." *See* Concise Statement of Matters Complained of on Appeal, 3/1/17.

10

In Pennsylvania, "whoever, being of the age of 18 years and upwards, by any course of conduct in violation of Chapter 31 (relating to sexual offenses) corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of an offense under Chapter 31 commits a felony of the third degree." 18 Pa.C.S.A. § 6301(a)(1)(ii).

As mentioned above, the Appellant was convicted of two counts of corruption of minors, a felony, under Section 6301(a)(1)(ii). He asserts that the Commonwealth failed to establish that he engaged in a "course of conduct" as required under this subsection. In *Commonwealth v. Kelly*, the Superior Court, in interpreting § 6301(a)(1)(ii), held that the phrase "course of conduct" imposes a requirement of multiple acts over time, and not just a single act. *Commonwealth v. Kelly*, 102 A.3d 1025, 1027 (Pa. Super. 2014) (finding that the defendant's single act of grabbing the victim's genitals did not establish a "course of conduct" supporting a conviction for corruption of minors). However, unlike the Defendant in *Kelly*, the Appellant herein committed several acts of sexual assault in this case, and with two separate victims. The evidence at trial established that the Appellant, over the course of the evening on August 11, 2014, took off his pants, asked the girls if they had ever had a threesome, and told them they should all get naked. N.T., 6/29/19, pp. 58, 142. He then committed a series of acts including putting his hands in M.M.'s pants [*Id.* at 59-60], putting his hand up M.M.'s shirt and touching her bra [*Id.* at 60-62], putting his fingers near K.J's vaginal area [*Id.* at 144], and humping K.J.'s leg [*Id.* at 143-44]. The court submits that these actions constituted indecent assault,[2] a Chapter 31 violation. Although these acts were committed within a short span of time, they were more than sufficient to satisfy the course of conduct requirement to sustain these corruption of minors

---

[2] The sufficiency of the evidence on this charge is expounded upon below.

11

charges. Accordingly, this court respectfully submits that his convictions for corruption of minors should be affirmed.

### b. Indecent Assault

Next, Appellant challenges the sufficiency of the evidence of his indecent assault convictions "as the Commonwealth did not meet the burden of proof that there was indecent contact as required for the two (2) counts of 18 Pa.C.S.A. § 3126 §§a8—Indecent Assault of a Person Less than 16 Years of Age, where the girls' testimony was directly in conflict with each other, and with their own prior recorded statements, and where the girls did not establish any actual indecent contact." *See* Concise Statement of Matters Complained of on Appeal, 3/1/17. The crime of indecent assault in Pennsylvania is defined as follows:

§ 3126. Indecent assault

(a) Offense defined.--A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:

\* \* \*

(8) the complainant is less than 16 years of age and the person is four or more years older than the complainant and the complainant and the person are not married to each other.

18 Pa.C.S.A. § 3126(a) (8).

Indecent contact is defined as "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." 18 Pa.C.S.A. § 3101. Contact may be indecent even though the clothing of a defendant or a victim prevents their flesh from touching. *See* Pa. SSJI (Crim), 15.3126D (2008). Here, M.M. testified that the Appellant tried to kiss her, put his hands in her pants and touched her vaginal area, and put his hands up her shirt and touched her breast. N.T., 6/29/19, pp. 59-62. K.J. testified that the

Appellant put his fingers near her vaginal area and then put her foot in between his legs and "humped her." *Id.* at 143-44. The Appellant claims that the Commonwealth did not meet the burden in proving two instances of indecent contact to sustain his two indecent assault convictions. Interestingly, the evidence at trial established more than two instances of indecent contact. It is arguable that the Appellant's actions in touching the intimate parts of M.M. and K.J. was sufficient to prove *more* than two counts of indecent assault. He committed indecent assault when he (1) kissed M.M. *See e.g., Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006) (the act of wrapping one's arms around another person and inserting one's tongue into another's mouth clearly involves the touching of an intimate part of that person), (2) put his hand up M.M.'s shirt over her bra. *See Commonwealth v. McClintic*, 851 A.2d 214 (Pa. Super. Ct. 2004), *rev'd on other grounds*, 589 Pa. 465, 909 A.2d 1241 (2006) (evidence was sufficient to support finding that defendant touched victim in sexual manner, as required to support conviction for indecent assault when he reached out and forcefully grabbed and pinched victim's breast), (3) touched M.M.'s vaginal area, (4) touched K.J.'s vaginal area, and (5) when he "humped" K.J.'s leg. *See e.g.,Commonwealth v. Pettiford*, 10 Pa. D. & C. 4th 413 (Pa. Com. Pl. Somerset 1991) (finding that the Commonwealth established a prima facie case that the defendant committed indecent assault by rubbing and touching victim's leg). The court respectfully submits that the evidence was more than sufficient to sustain his convictions of indecent assault and respectfully submits that they should be affirmed.

## II. Weight of the Evidence

The Appellant also challenges his verdict by asserting that "the testimony of the alleged victims was so in conflict with each other, and with their own prior recorded statements, that the same cannot be the grounds for guilt beyond a reasonable doubt on any of the charges." *See*

Concise Statement of Matters Complained of on Appeal, 3/1/17. Challenges to witness credibility generally implicate the weight, not the sufficiency, of the evidence. *See Commonwealth v. Price,* 616 A.2d 681, 683 (Pa. Super. 1992) (a sufficiency challenge asks whether the evidence supports a conviction and an argument that a witness's testimony is not credible goes to the weight of the evidence).

An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Ramtahal,* 613 Pa. 316, 33 A.3d 602 (2011). A trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to *shock one's sense of justice. Commonwealth v. Diggs,* 597 Pa. 28, 949 A.2d 873 (2008) (emphasis added). It is well established that a challenge to the weight of the evidence is limited to a review of the discretion of the trial judge, who has had the opportunity to observe the proceedings and demeanor of the witnesses. *Commonwealth v. Cunningham,* 805 A.2d 566, 572 (Pa. Super. 2002). That decision will not be reversed on appeal absent a showing of an abuse of discretion. *Commonwealth v. Petteway,* 847 A.2d 713, 717 (Pa. Super. 2004). Moreover, the uncorroborated testimony of the victim of a sexual offense, if believed by the jury, is sufficient to support a conviction. *Commonwealth v. Poindexter,* 646 A.2d 1211, 1214 (Pa.Super.1994); *see also* Pa. SSJI (Crim), 4.13B (2005).

In the case *sub judice,* Appellant was found guilty of two counts of corruption of minors, a felony of the third degree, and two counts of indecent assault, a misdemeanor of the second degree. This court submits that the jury was free to believe or disbelieve any of the testimony and evidence, and submits that the testimony of the victims was sufficient evidence to sustain the verdict. As set forth in detail in the preceding section, the Commonwealth's evidence at trial was more than sufficient to establish that the Appellant had indecent contact with both victims in this

14

case, and it is evident that the jury found the testimony of these victims to be credible.

Respectfully, the jury's verdict did not shock one's sense of justice as to require a new trial. It is not for this court to substitute its own judgment for that of the jury in Appellant's case. The court respectfully submits that its denial of Appellant's weight of evidence claim was not an abuse of discretion.

### III. Interview of Victim by Defense Expert

The Appellant claims that this court erred by precluding a defense expert from interviewing the victim K.J. in this case. Specifically, the Appellant argues that "the Trial Court abused its discretion and/or erred as a matter of law by precluding Defendant's expert from interviewing victim K.J., notwithstanding that the same is required by the code of ethics governing experts testifying to psychiatric matters, and by limiting the expert testimony to such a degree that Defense's expert was incapable of ethically rendering an expert opinion to a reasonable degree of medical certainty at trial." *See* Concise Statement of Matters Complained of on Appeal, 3/1/17. The court respectfully submits that it did not err in precluding the defense from interviewing the minor victim.

Prior to trial in this case, defense counsel requested that his expert have access to the minor victim, K.J. in this case in order to evaluate her competency.[3] The defense argued that the victim was not competent to testify at trial. This court, relying on cases including *Commonwealth v. Alston*, 864 A.2d 539 (Pa. Super. 2004), *Commonwealth v. Dudley*, 510 A.2d 1235 (Pa. Super. 1986), *Commonwealth v. Tober*, 152 A.2d 917 (Pa. Super. 1959), and following a competency hearing of the minor victim,[4] ruled that the defense was not entitled to interview a minor victim

---

[3] The victim's redacted medical records had been turned over to the defense in discovery and revealed that she suffered from hallucinations.
[4] The court found the minor victim competent.

15

and denied this request. Specifically, the court found that there was nothing in the record to indicate that the victim's medical diagnoses affected her ability to perceive or recollect the alleged events.[5] See N.T., 6/30/17, pp. 9-10. The victim testified that while she had suffered from hallucinations and saw ghost like figures, this occurred when she was 11 years old, not at the time of the incident. *Id.* at 13-16, 25. The court submits that this ruling was proper.[6]

## IV. Irrelevant Evidence

Lastly, the Appellant claims that this court erred in its ruling that the Facebook profile of victim M.M. would not be admitted at trial. The court respectfully submits that because this evidence had no probative value and was irrelevant, it was properly excluded from trial.

The admission of evidence is solely within the discretion of the trial court judge and will not be reversed absent an abuse of discretion. *Commonwealth v. Ketterer*, 725 A.2d 801, 805 (Pa. Super. 1999) ("A trial court has broad discretion to determine whether evidence is admissible.") Under Pennsylvania Rule of Evidence 403, although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Pa.R.E. Rule 403. The Comments to the rule state that "unfair

---

[5] *See Commonwealth v. Dolhancryk*, 417 A.2d 246 (Pa. Super. 1979) (absent evidence that witness suffered mental defect rendering him incapable of testifying truthfully, no psychiatric examination was warranted).

[6] The court advised defense counsel that he would be permitted to have his expert present in court during the trial to observe the victim and her testimony and could then cross examine the minor victim regarding her prescribed medication use and/or have his expert opine on the use and the effects of said medication. However, at trial, the victim denied that she had taken any medication at the time of the incident. *See Dudley*, 510 A.2d at 620 (evidence can be said to affect the credibility of a witness when it shows that his mental disorganization in some way impaired his capacity to observe the event at the time of its occurrence, to communicate his observations accurately and truthfully at trial, or to maintain a clear recollection). Here, the victim testified that she was not suffering from any mental infirmity near the time of the event, and was not on any medication that would have impacted her mental state. Accordingly, the testimony of an expert on this matter was not relevant.

16

prejudice" refers to a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.

In the case *sub judice*, defense counsel moved to admit evidence pertaining to victim M.M.'s social media account. Specifically, counsel wanted to admit a posting that M.M. had made to her Facebook account the night prior to trial and a photograph associated with her account. Following a discussion at sidebar, this court denied defense counsel's request.

[Sidebar discussion]

THE COURT: What do you have?

DEFENSE COUNSEL: She [M.M.] posted yesterday about how she would lie for her friend if she showed up on a scene like this.

THE COURT: Your best friend calls -- what's it say?

DEFENSE COUNSEL: It says your best friend calls and says he or she needs help with something and you get there and see this,[7] what do you do? And she says hitting the store for new carpets, set of -- a new bed set, bleach the wood and throw everything in the ocean.

THE COMMONWEALTH: What does that have to do with anything?

DEFENSE COUNSEL: It has directly to do with how she would conduct herself in a criminal situation.

THE COMMONWEALTH: Judge, I mean this is nothing to do with anything. This is a joke meme that they would ask what would you do if your friend murdered somebody and says –

N.T. 6/29/16, pp. 103-04.

\* \* \*

DEFENSE COUNSEL: Well, will you allow us to post 12 her Facebook page so the jury can see who she is telling people she is? I mean there's a photograph, and they're looking at two different people. And then the jury can determine once again with our theory if she wants them to believe her and she's of this innocent and doesn't lie -- and here she has this completely alter ego.

\* \* \*

---

[7] The court did not see what "this" referred to but Defendant's attorney said "this" was a murder scene.

THE COMMONWEALTH: Judge, this so far afield of anything relevant. The idea that she has some alternate ego on the internet -- I mean first of all it's just –

DEFENSE COUNSEL: Well, she does.

*Id.* at 107-08.

After hearing the arguments of counsel, this court denied the request and ruled that the evidence was irrelevant. In so ruling, the court stated, "I'm not going to allow you to put a photograph of her up because the -- there's no issue of [] mistake in age or anything of this nature. And that's the ruling of this Court. *Id.* at 111. The court submits that it acted well within its discretion in excluding any evidence of the victim's social media account. This evidence had no probative value and was merely a tactic to besmirch the character of the young victim in this case.

### III. Conclusion

In light of the aforementioned, it is respectfully submitted that the court's decision was free from legal error and that there is no merit to Appellant's appeal. It is for the reasons set forth above that this court submits that Appellant's judgment of sentence be affirmed.

BY THE COURT:

GREGORY M. MALLON, JUDGE

FILED 2017 MAY -2 PM 12: 17

18